# In the United States Court of Federal Claims

No. 21-1823 C
Filed Under Seal: December 22, 2021
Reissued: January 13, 2022[*]

```
* * * * * * * * * * * * * * ** *
                                *
CACI, INC.-FEDERAL,             *
                                *
                Plaintiff,      *
                                *
        v.                      *
                                *
THE UNITED STATES,              *
                                *
                Defendant,      *
                                *
GENERAL DYNAMICS MISSION        *
SYSTEMS, INC., and SIERRA       *
NEVADA CORPORATION,             *
                                *
        Defendant-Intervenors.  *
                                *
* * * * * * * * * * * * * * * * *
```

*Gary J. Campbell*, with whom were *G. Matthew Koehl* and *Miles McCann*, Womble Bond Dickinson LLP, all of Washington, D.C., for Plaintiff.

*Daniel Falknor*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Reginald T. Blades, Jr.*, Assistant Director, *Martin F. Hockey, Jr.*, Acting Director, and *Brian M. Boynton*, Acting Assistant Attorney General, all of Washington, D.C., for Defendant, and *Major Michael R. Tregle, Jr.*, Trial Attorney, U.S. Army Legal Services Agency, of Fort Belvior, VA, of counsel.

*Shaun C. Kennedy*, with whom were *Chris R. Hogle*, *Thomas A. Morales*, *Hannah E. Armentrout*, and *Ryan K. Lundquist*, Holland & Hart LLP, all of Denver, CO, for Defendant-Intervenor Sierra Nevada Corp.

*Noah Benjamin Bleicher*, with whom were *Jeri K. Somers*, *Carla J. Weiss*, and *Scott E. Whitman*, Jenner & Block LLP, all of Washington, D.C., for Defendant-Intervenor General Dynamics Mission Systems, Inc.

---

[*]     Pursuant to the protective order entered in this case, this opinion was filed initially under seal.  The parties provided proposed redactions of confidential or proprietary information.  In addition, the Court made minor typographical and stylistic corrections.

## OPINION AND ORDER

**SOMERS,** Judge.

On September 8, 2021, Plaintiff CACI, Inc.-Federal ("CACI") filed a complaint in this Court challenging the United States Army's award of a contract in August 2021 to Defendant-Intervenors General Dynamics Mission Systems, Inc. ("GDMS") and Sierra Nevada Corporation ("Sierra Nevada" or "SNC") for the design and manufacture of the Next Generation Load Device Medium ("NGLD-M" or "device"). ECF No. 1 ("Compl.").[1] Plaintiff asserts that the Army misevaluated its proposal and applied unstated evaluation criteria in assigning its proposal three deficiencies and two weaknesses. *Id.* at 2.

Plaintiff filed a motion for judgment on the administrative record, ECF No. 42 ("CACI MJAR"), on October 18, 2021, to which the government and Defendant-Intervenors filed cross-motions. *See* ECF Nos. 48 ("USA MJAR"), 49 ("SNC MJAR"), 50 ("GDMS MJAR"). Additionally, Sierra Nevada and the government filed motions to dismiss, asserting that CACI lacked standing because of an organizational conflict of interest ("OCI") that made CACI ineligible for award even if it was successful on the merits of its protest. *See* ECF No. 43 ("SNC Mot. to Dismiss"); USA MJAR at 18-25. For the reasons that follow, the Court finds that Plaintiff has not met its burden to establish standing to bring this bid protest. Moreover, in the alternative, even if CACI had standing, it has failed to demonstrate that the three deficiencies it received were the result of actions by the Army that were arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

## BACKGROUND AND PROCEDURAL HISTORY

On November 16, 2020, the Army issued Request for Proposal No. W15P7T-21-R-0001 for the design, development, and production of the NGLD-M. AR Tab 14. The NGLD-M will be used by the Army on the battlefield to encrypt and decrypt sensitive information. The device will need to be certified and approved by the National Security Agency ("NSA") before the Army's implementation. *Id.* The solicitation was amended and reissued on December 3, 2020, and then again on January 11, 2021. AR Tab 15-16. The solicitation provided that the Army could award up to two contracts but "reserve[d] the right to make a single award or no award at all." AR 1515. It required offerors to address various technical aspects of the NGLD-M. Specifically, offers were required to:

> include all data and information requested by the [Solicitation] and shall be submitted in accordance with (IAW) these instructions. The Offeror shall address the requirements outlined in the Engineering Development Performance Work Statement (PWS), Program Management Statement of Work (SOW), Contract Data Requirements Lists (CDRLs), NGLD-M System Requirements Document

---

[1] Plaintiff filed an amended complaint on November 3, 2021. ECF No. 47. The primary change made in Plaintiff's amended complaint is a new allegation that Sierra Nevada has an organizational conflict of interest that disqualifies it from award. *See id.* ¶ 86-91. The amended complaint was neither filed within the time prescribed by RCFC 15(a)(1), nor did CACI have the consent of the government or leave of the Court to file. Accordingly, for the reasons set forth in ECF No. 60, the Clerk was directed to strike the amended complaint.

(SRD), Technical Security Requirements Document (TSRD), and the Information
Assurance Security Requirements Directive (IASRD).

AR 1499.

The solicitation notified offerors that failing to address these factors could result in their
proposal being eliminated from further consideration. *Id.* Offerors' proposals were evaluated on
four factors: Technical; Cost; Past Performance; and Small Business Participation. AR 1514.
Technical and cost ratings were weighed "approximately equal in importance" to each other, but
both categories were "significantly more important" than the rating for past performance. *Id.*
Small Business Participation was rated on an "acceptable/unacceptable basis." *Id.*

The solicitation also detailed that the technical evaluation would be rated on four sub-
factors: (1) Hardware and Application Programming Interface ("API") Integration/Description
Approach; (2) User Application Software ("UAS") Approach/Key Management Interface
Implementation; (3) Management; and (4) Production. *Id.* The solicitation informed offerors
that the Army would rate the technical evaluation as follows:

> Strength: is an aspect of an offeror's proposal that has merit or exceeds specific
> performance or capability requirements in a way that will be advantageous to the
> Government during contract performance.
>
> Weakness: means a flaw in the proposal that increases the risk of unsuccessful
> contract performance. A significant weakness in the proposal is a flaw that
> appreciably increases the risk of unsuccessful contract performance.
>
> Significant Weakness: means a flaw in the proposal that appreciably increases the
> risk of unsuccessful contract performance.
>
> Deficiency: is a material failure of a proposal to meet a Government requirement
> or a combination of significant weaknesses in a proposal that increases the risk of
> unsuccessful contract performance to an unacceptable level.

AR 1519-20.

Based on the above ratings, the Army would then score the proposals on a combined
technical evaluation from "Outstanding" to "Unacceptable" as set forth in the following table:

| TABLE M1. COMBINED TECHNICAL/RISK RATINGS | | |
|---|---|---|
| Color | Rating | Description |
| BLUE | Outstanding | Proposal indicates an exceptional approach and understanding of the requirements and contains multiple strengths, and risk of unsuccessful performance is low. |
| PURPLE | Good | Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength, and risk of unsuccessful performance is low to moderate. |
| GREEN | Acceptable | Proposal indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate. |
| YELLOW | Marginal | Proposal has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high. |
| RED | Unacceptable | Proposal does not meet requirements of the solicitation, and thus, contains one or more deficiencies, and/or risk of unsuccessful performance is unacceptable. Proposal is unawardable. |

AR 1520.

The Army evaluated the offerors in two phases: an initial phase and, in accordance with Federal Acquisition Regulation ("FAR") 15.306, a second phase for those offerors within the competitive range. *See generally* AR Tab 32. On January 13, 2021, during the initial evaluation phase, the Army received proposals from five different offerors, including SNC, GDMS, and CACI. The proposals from both SNC and GDMS received the highest technical rating of "Outstanding," AR 6885, 6895, and both progressed to the next phase of the Army's evaluation process. AR 5331-33. Plaintiff CACI received a score of "Unacceptable" on its combined technical factors, based in part on the Army finding a "deficiency" with Plaintiff's proposal under the API Integration/Description sub-factor for failing to adequately detail how it would meet certain authentication requirements. AR 6910. Despite the deficiency, the Army viewed Plaintiff's offer as "among the most highly rated proposals submitted" and determined it would be readily feasible for Plaintiff to make corrections. AR 5334 ("The technical deficiency that led to the unacceptable rating is not one that would require a complete redesign and/or proposal rewrite; this is also the case for the significant weaknesses identified in the technical evaluation."). Accordingly, Plaintiff remained within the competitive range for award and advanced to the second phase of the acquisition process along with SNC and GDMS. *Id.* The other two offerors were eliminated from further consideration. AR 5334-37.

Through letters dated June 7, 2021, the Army notified SNC, GDMS, and Plaintiff that their proposals were within the competitive range and invited them to submit revised and final

proposals.  AR 5282-95.  On June 18, 2021, the Army received the offerors' revised proposals. In the second evaluation, SNC and GDMS once again received the highest attainable score of "Outstanding" under the technical factor without any weaknesses, significant weaknesses, or deficiencies.  AR 5042-43, 5051-52.

Plaintiff, on the other hand, was again given an "Unacceptable" technical rating based on the Army identifying three deficiencies in its technical evaluation of Plaintiff's proposal.  AR 5062-64, 5066-67.  The Army determined that, in attempting to correct the deficiency related to the authentication requirements identified in the initial evaluation phase, Plaintiff created three *new* deficiencies.  *Id.*  The Army gave Plaintiff two deficiencies related to its USB port based on finding that its design would be incapable of simultaneously performing two required functions. AR 5066-67.  Plaintiff's proposal received a third deficiency for failing to specify the external dimensional measurements of its device, and, therefore, the Army determined it was "unclear if the proposed design meets the NGLD-M length and weight requirements."  AR 5063.  In addition, Plaintiff's proposal received two weaknesses on its technical approach.  AR 5064-65, 5067.

On August 9, 2021, the Army's Source Selection Advisory Council ("SSAC") recommended that both SNC and GDMS be awarded contracts for the NGLD-M, as their proposals represented the best value to the government.  AR 7123.  The report also concluded that Plaintiff's proposal failed to meet the requirements of the solicitation and summarized the three deficiencies.  AR 7122-23.  As the solicitation makes clear, even one deficiency renders a proposal "Unacceptable" under the technical factor and automatically unawardable.  AR 1520 ("Red/Unacceptable-Proposal does not meet requirements of the solicitation, and thus, contains one or more deficiencies, and/or risk of unsuccessful performance is unacceptable.  Proposal is unawardable."); *see also* AR 7122.  The SSAC report summarized the offerors' scores in the following chart:

| Offeror | Technical | Past Performance | Small Business Participation | FPR Price | Total Evaluated Price |
|---------|-----------|------------------|------------------------------|-----------|-----------------------|
| [SNC] | Outstanding | Substantial Confidence | Acceptable | ███████ | $544,267,922 |
| [GDMS] | Outstanding | Substantial Confidence | Acceptable | ███████ | $229,952,952 |
| [CACI] | Unacceptable | Substantial Confidence | Acceptable | ███████ | Undetermined |

AR 7120.

On August 10, 2021, the Army awarded SNC and GDMS contracts on the NGLD-M solicitation.  AR Tabs 52, 55.  The Army notified Plaintiff on August 11, 2021, that it was "not selected for award" and that the "decision was driven by the unacceptable rating."  AR 7137-38. The notification also highlighted the ratings of the three offerors' proposals and included a summary of Plaintiff's deficiencies and weaknesses.  *Id.*  The Army, pursuant to FAR 15.506, provided a post-award debriefing to CACI.  *See generally* AR Tab 58.  Additionally, the Army,

on August 23, 2021, provided further information to CACI based on questions CACI submitted regarding the evaluation process. *See generally* AR Tab 59.

CACI filed this post-award bid protest on September 8, 2021. The complaint alleges, *inter alia*, that the Army unreasonably assigned three deficiencies to Plaintiff's technical proposal. *See* Compl. at 32-38. Plaintiff argues that but for these errors, it would have been awarded the NGLD-M contract over SNC because of CACI's lower price proposal. CACI asks the Court to enjoin performance on the contract and require the Army to re-evaluate the proposals. *Id.* at 50.

Defendant-Intervenor SNC and the government filed motions to dismiss Plaintiff's complaint under Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"), arguing that CACI has not established that it has standing to protest the award because it is not an "interested party." *See* SNC Mot. to Dismiss; USA MJAR at 18-25. Based on prior task orders CACI performed for the Army, SNC and the government argue that CACI has an unmitigable, biased ground rules OCI disallowing it from being awarded the contract at issue regardless of the errors that CACI alleges the Army made in its technical evaluation, and, therefore, Plaintiff cannot clear the "prejudice" threshold to establish standing. SNC Mot. to Dismiss at 8-18.

On December 7, 2021, the Court held oral argument on the pending motions, and the matter is now ripe for consideration.

## DISCUSSION

### A.    Legal Standard

The Tucker Act, as amended by the Administrative Dispute Resolution Act, provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement . . . ." 28 U.S.C. § 1491(b)(1). In such actions, the Court "shall review the agency's decision pursuant to the standards set forth in section 706 of title 5." 28 U.S.C. § 1491(b)(4). Accordingly, the Court examines whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. Under such review, an "award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

On the first ground, "the courts have recognized that contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." *Id.* (citations and internal quotations omitted). Thus, the Court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, . . . and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Id.* at 1332-33 (citations and internal quotations omitted). On the second ground, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333 (citation and internal quotation omitted).

Bid protests are generally decided on cross-motions for judgment on the administrative record, pursuant to RCFC 52.1.  RCFC 52.1 requires that the Court "make factual findings from the record evidence as if it were conducting a trial on the record."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354 (Fed. Cir. 2005).  "Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record."  *Id.* at 1355-56.  Therefore, in reviewing cross-motions for judgment on the administrative record, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  *Jordan Pond Co., LLC v. United States*, 115 Fed. Cl. 623, 630 (2014).

However, before the Court can proceed to the merits of a bid protest, a protestor must establish that it has standing.  *Castle v. United States*, 301 F.3d 1328, 1337 (Fed. Cir. 2002) ("Standing is a threshold jurisdictional issue, which . . . may be decided without addressing the merits of a determination."); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("The party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing].").  As standing is a jurisdictional issue, it may be raised in a motion to dismiss under RCFC 12(b)(1).  In considering a motion to dismiss for lack of subject matter jurisdiction, the Court must accept a plaintiff's well-pleaded factual allegations as true and draw all reasonable inferences in the light most favorable to that party.  *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1347 (Fed. Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  If a challenge is raised to subject matter jurisdiction, the plaintiff has the burden of proving that the Court has jurisdiction by a preponderance of the evidence.  *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).

## B.    Plaintiff Has Not Established That It Has Standing

"It is well-established that the plaintiff bears the burden of establishing the court's jurisdiction by a preponderance of the evidence."  *Brandt v. United States,* 710 F.3d 1369, 1373 (Fed. Cir. 2013).  In bid protests, "[o]nly an 'interested party' has standing to challenge a contract award."  *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012) (citing *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006); 28 U.S.C. § 1491(b).  This means that in bid protests standing "is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract."  *Am. Fed'n of Gov't Emps., AFL-CIO v. United States,* 258 F.3d 1294, 1302 (Fed. Cir. 2001).  Accordingly, Plaintiff must prove two elements to establish that it has standing: (1) that it is an actual or prospective offeror, and (2) that it possesses a direct economic interest in the award of the contract.  *CGI Fed. Inc. v. United States*, 779 F.3d 1346, 1348 (Fed. Cir. 2015).  There is no question that Plaintiff is an actual offeror.  Thus, the question of standing turns on whether Plaintiff had a direct economic interest in the award of the Army's NGLD-M contract.

In order to establish that it had a direct economic interest in the NGLD-M procurement, Plaintiff must demonstrate prejudice.  *See Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002) ("[P]rejudice (or injury) is a necessary element of

standing"). Moreover, "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits." *Info. Tech. & Applications v. United States,* 316 F.3d 1312, 1319 (Fed. Cir. 2003). Since this is a post-award bid protest, to establish prejudice Plaintiff "*must* show that there was a 'substantial chance' it would have received the contract award *but for the alleged error* in the procurement process." *Id.* (emphasis added); *see also Labatt Food Serv., Inc. v. United States,* 577 F.3d 1375, 1378 (Fed. Cir. 2009) ("A party has been prejudiced when it can show that but for the error, it would have had a substantial chance of securing the contract.") (citations omitted). In other words, to demonstrate that it had standing, Plaintiff needed to "establish that it 'could compete for the contract' if the bid process were made competitive." *Myers,* 275 F.3d at 1370 (quoting *Impresa,* 238 F.3d at 1334). That is to say, Plaintiff was required to show that, assuming arguendo it was successful on the merits, it was eligible to be awarded a contract and thus had an economic interest in the outcome.

Plaintiff has failed, however, to carry its burden to demonstrate that it would be eligible for award if the Court agreed with its arguments on the merits. A contract may not be awarded to an "apparent successful offeror" if "a conflict of interest is determined to exist that cannot be avoided or mitigated." 48 C.F.R. 9.504(e). It was alleged, and the Administrative Record appears to demonstrate, that Plaintiff had a conflict of interest that could not be avoided or mitigated; therefore, the burden was on Plaintiff to prove that no such conflict existed.

FAR subpart 9.5 describes three categories of OCIs: biased ground rules, unequal access to information, and impaired objectivity. The government and SNC assert that CACI has a biased ground rules OCI with regard to the NGLD-M solicitation. They further argue that because a biased ground rules OCI cannot be avoided or mitigated, Plaintiff would not have been eligible for the award of a contract pursuant to the solicitation regardless of the merits of its protest and, therefore, lacks standing. *See generally* SNC Mot. to Dismiss; USA MJAR at 18-25; *see also* 48 C.F.R. § 9.504(e) (barring the award of a contract to an "apparent successful offeror" if "a conflict of interest [was] determined to exist that cannot be avoided or mitigated.").

"The biased ground rules category of OCIs focuses on the concerns that a company may, by participating in the process of setting procurement ground rules, have special knowledge of the agency's future requirements that may skew the competition in its favor." *Turner Const. Co. v. United States,* 645 F.3d 1377, 1382 (Fed. Cir. 2011). Because of the "highly influential and responsible position" of contractors that performed systems engineering and technical direction,

> [a] contractor that provides systems engineering and technical direction for a system but does not have overall contractual responsibility for its development, its integration, assembly, and checkout, or its production *shall not* – (1) be awarded a contract to supply the system or any of its major components or (2) be a subcontractor or consultant to a supplier of the system or any of its major components.

48 C.F.R. § 9.505–1(a) (emphasis added). In other words, "[t]he FAR prohibits a [systems engineering and technical direction] contractor, as either a prime contractor or a subcontractor, from supplying any of the system's major components, without regard to whether work was

8

performed as to that particular component." *Filtration Dev. Co., LLC v. United States*, 60 Fed. Cl. 371, 379 (2004).

The Army required all offerors to identify any potential OCIs related to the procurement. AR 1500.  In response, Plaintiff disclosed that it had performed two Systems Engineering and Technical Assistance ("SETA") contracts related to the NGLD-M procurement.[2]  AR 2244-45. First, it disclosed that CACI was a contractor on a task order that resulted in the Capability Production Document ("CPD") from which the technical and operational requirements for the NGLD-M were derived.  *See* AR 1198 ("The SRD identifies requirements to develop the NGLD-M and its interfaces.  The requirements in this document are derived from the Capability Production Document (CPD) for NGLD family of systems Version (v) 1.05, dated 22 April 2013.").  As part of this task order, a CACI employee "supported the development" of the CPD and that employee was listed as a "Secondary Point of Contact" on the cover page of the CPD. AR 2244; ECF No. 55-1.  Plaintiff also disclosed that two other employees assisted in developing the CPD as part of CACI's CPD task order.  AR 2244.  Second, Plaintiff disclosed that a "small portion of CACI's work" on a separate 2014 SETA task order "provided support to the NGLD-M program."  AR 2244-45.  In short, as part of its proposal, CACI admits it did SETA work related to the NGLD-M by working on the development of the CPD and on the 2014 task order.

Indeed, as SNC correctly observes, "[t]he specifications in the CPD in fact pervade all of the technical and operational requirement[s] for the NGLD-M set forth in the Solicitation."  SNC Mot. to Dismiss at 11.  And, moreover, "the Solicitation indicates the Army utilized the CPD developed through CACI's SETA task orders to create the technical and operational requirements for the NGLD-M."  *Id*. at 12.  Specifically, the CPD was used to develop the SRD, which outlines the technical requirements in the NGLD-M solicitation.  *See generally* AR 1270-1343.  In fact, the NGLD-M SRD Requirements Traceability Matrix contains a column sourcing each SRD requirement to the CPD.  *Id*.  It would appear, therefore, that at the very least there is prima facie evidence that CACI's prior work on the task order that resulted in the CPD created a biased ground rules OCI that would disqualify CACI from being awarded a contract pursuant to the solicitation.

The government attempts to buttress this prima facie evidence with a November 5, 2021, declaration from the Contracting Officer ("CO") declaring that "a biased ground rules OCI exists" and that "there is no question that the CPD would be part of the RFP for the NGLD-M program when it was developed; that was the entire purpose of the CPD development and

---

[2] Plaintiff takes significant issue with the use of the term "systems engineering and technical assistance" versus the FAR's use of the term "systems engineering and technical direction."  It appears that the two terms are regularly used interchangeably in government contracting and that there is quite a bit of overlap between them. *Compare* 48 C.F.R. § 9.505-1(b) (2021) *with* 48 C.F.R. § 209.571-1 (2021).  The problem though for Plaintiff, as is discussed more fully below, is that Plaintiff had the burden of proving standing, something it could not do simply by attacking the slight possible differences between the meanings of the terms "systems engineering and technical assistance" and "systems engineering and technical direction."  Moreover, Plaintiff itself alerted the Army to this potential OCI while referring to the potentially conflict-creating task orders as systems engineering and technical assistance contracts.  If Plaintiff really believes there is a meaningful difference between the two terms, then there was no need to have put the OCI statement in its proposal since it characterized its task orders as systems engineering and technical assistance contracts, not systems engineering and technical direction contracts.

approval process as clearly stated in the CPD."  ECF No. 52-1 at 3-4.  The CO concluded in his declaration that "CACI did perform SETA work related to the NGLD-M program under previous task orders.  That SETA work does constitute a biased ground rules OCI that cannot be mitigated and which no waiver exists." *Id.* at 4.  Thus, he determined, "[i]n the event that CACI is successful in protest of the award of the NGLD-M procurement, CACI will not be eligible for award." *Id.*

Normally, the Court would need to assess how much weight, if any, to give this declaration because of the alleged procedural issues with its promulgation and alleged problems with the reasoning contained therein. *See Sys. Plus, Inc. v. United States*, 69 Fed. Cl. 757, 763-69 (2006).  However, in this case, Plaintiff has completely failed to offer any evidence whatsoever that it did not have a biased ground rules OCI (much less evidence sufficient to overcome the prima facie evidence of a biased ground rules OCI that is apparent on the face of its proposal and in the sourcing of the technical requirements contained in solicitation and related documents).  Rather than offer any evidence that the apparent OCI was not in fact an OCI (and, therefore, attempt to meet its burden to establish standing), Plaintiff instead focused its response to the motions to dismiss on alleged procedural deficiencies with, perceived terminology issues in, and the timing of, the CO's declaration.  Plaintiff's burden, however, was not to demonstrate that the government and SNC had not established that an OCI exists; its burden was to prove by a preponderance of the evidence that it has standing. *See Reynolds*, 846 F.2d at 748 (holding that a plaintiff "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence").

This is a burden Plaintiff made no attempt to meet.  Plaintiff failed to provide this Court with a single piece of evidence to show it did not have an OCI.[3] *See Moyer v. United States,* 190 F.3d 1314, 1318 (Fed. Cir. 1999) ("Fact-finding is proper when considering a motion to dismiss where the jurisdictional facts in the complaint . . . are challenged.").  There are myriad ways through which CACI could have come forward with some evidence to attempt to establish that it did not have a biased ground rules OCI and thus standing to bring the instant protest.  For instance, assuming that a biased ground rules OCI does not in fact exist, CACI could have simply introduced an affidavit from its former employee who was the secondary point of contact on the CPD task order explaining whether she or anyone else from CACI took part in systems engineering and technical direction as part of that task order.  Such a declaration may have been sufficient to establish standing.  But CACI instead chose to attack the CO's declaration.  If it was

---

[3] The closest Plaintiff comes to attempting to offer any evidence that an OCI does not exist was its attachment of a letter it sent to the CO in September 2020 regarding why it did not believe an OCI existed.  ECF No. 55-5.  This letter is largely redundant of the OCI statement in its proposal.  However, the letter does nothing to explain why the SETA work CACI admits it did on the NGLD-M does not in fact constitute systems engineering and technical direction.  In fact, the letter confirms that CACI did SETA work on the NGLD-M.  It then cleverly attempts to dismiss its employee's role by noting that her role was to provide "logistical and administrative support" to the Army as it *reviewed and approved* the CPD.  It does not explain why logistical and administrative support could not constitute systems engineering and technical direction, but more importantly it says nothing about what her role was in the development of the CPD itself, which was then reviewed and approved by the Army.  The point is that CACI's employee supported the development of the CPD as part of a CACI task order and thus could have been "in a position to make decisions favoring its own products or capabilities." 48 C.F.R. § 9.505–1(b).  The letter does nothing to disprove this, nor does it explain in any way that the work CACI did was not in fact systems engineering and technical direction for the NGLD-M.

the government's burden to establish that standing *does not* exist, this tactic may have proved fruitful.

Unfortunately for CACI, it bears this jurisdictional burden, not the government.  And because the obligation to establish standing is not a mere pleading requirement "but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan,* 504 U.S. at 561.  Although judges of this Court have at times indicated that at the standing stage only a "limited review" is conducted, CACI failed to provide the Court with *anything* to review other than arguments as to why the CO's declaration is "faulty."  But none of these arguments as to why the CO's declaration is "faulty" demonstrate that CACI did not provide systems engineering and technical direction for the NGLD-M, past services that make it ineligible for award of the contract at issue.

Plaintiff argues at length that "[t]he Agency's post-hoc, faulty OCI determination does not deprive the Court of subject matter jurisdiction."  ECF No. 55 at 5 ("CACI Reply").  Plaintiff's argument, however, misses the point.  It is not the "Agency's post-hoc, faulty OCI determination" that is depriving the Court of jurisdiction.  It is Plaintiff's failure to offer any evidence to show that it did not have an OCI, and thus was eligible for award, that deprives the Court of jurisdiction.  If the CO's declaration was the lynchpin of the standing inquiry, attacking it with the reasoning used in *Systems Plus, Inc. v. United States* may have aided Plaintiff.[4]  But, as is explained above, the CO's declaration is not what is depriving the Court of jurisdiction.  Moreover, in *Systems Plus*, unlike the instant case, the plaintiff offered evidence in the form of a declaration and a memorandum from a fact witness that significantly undermined, if not disproved, the alleged OCI.  69 Fed. Cl. at 768.

In sum, once the OCI issue was raised, it was Plaintiff's burden to affirmatively demonstrate that there was no OCI and that it was thus eligible for award.  Because Plaintiff has not shown that it was eligible for award, it has no economic interest in the outcome of the Army's NGLD-M solicitation.  That is to say, even if the Court assumed all the factual allegations Plaintiff makes on the merits of its protest are true and that Plaintiff was prejudiced by the alleged procurement process errors, Plaintiff has not shown that it was eligible for award.  Without an economic interest in the outcome, Plaintiff does not have standing to challenge the government's award of the contracts to SNC and GDMS.

## C.    Even if Plaintiff Had Standing, the Government and Defendant-Intervenors Would Nonetheless Be Entitled to Judgment on the Administrative Record

Even had Plaintiff been able to demonstrate that it had standing, its protest would have nonetheless failed on the merits.  The Administrative Record demonstrates the reasonableness of

---

[4] *But see Turner Const. Co. v. United States*, 645 F.3d 1377, 1386 (Fed. Cir. 2011) ("With respect to the timing of the CO's investigations, the court explained that the FAR does not require a CO, in every single procurement, to review and document whether OCIs exist prior to award.  Courts reviewing bid protests routinely consider post-award OCI analyses and consider evidence developed in response to a bid protest . . . . If the first time an allegation or evidence of a potential OCI appears is after award, then the earliest time to evaluate that potential OCI as countenanced by § 9.504(a)(1) might be at that time.") (citations and internal quotations omitted).

the Army's actions—specifically, its assignment of three deficiencies to Plaintiff's proposal—in the NGLD-M procurement process.

### 1.  The Army Technical Evaluation Team Reasonably Assigned Two Deficiencies to CACI's Design Methodology

The parties first cross-move for judgment on the administrative record with regard to the technical evaluation team's ("TET") assignment of two deficiencies to Plaintiff's design—specifically, the detrimental effect that its chosen two-factor authentication ("2FA") solution would have on the device's ability to meet other design requirements.  Plaintiff alleges the agency erred in assigning the two deficiencies; the government and Defendant-Intervenors assert that the Army acted rationally in assigning both.  The Court finds the agency's actions entirely reasonable based on the record before the Court.

To review, "[i]t is well established that the evaluation of proposals for their technical quality generally requires the special expertise of procurement officials."  *KSC Boss All., LLC v. United States*, 142 Fed. Cl. 368, 380 (2019).  Thus, as in the instant case, "challenges concerning 'the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess.'"  *Enhanced Veterans Sols., Inc. v. United States*, 131 Fed. Cl. 565, 584 (2017) (quoting *E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed. Cir. 1996)).  The Court must merely "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, . . . and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  *Impresa*, 238 F.3d at 1332-33 (citations and quotes omitted).

Proceeding to the record, the Court looks first to what the Army's solicitation required.  Under a plain reading, the solicitation compels 2FA as a threshold requirement.  *See* AR 1272 (NGLD-M_SRD_0025 providing that "[t]he NGLD-M shall enforce two-factor authentication when started in Medium Assurance mode."); AR 1273 (NGLD-M_SRD_0033 providing that "[t]he NGLD-M shall enforce two-factor authentication when started in High Assurance mode."); AR 1275 (NGLD-M_SRD_055 providing that "[t]he NGLD-M shall support two factor authentication.").  Given this requirement, the Court next looks to what the Army's evaluators ultimately found.  The clearest reflection is the TET's evaluation of Plaintiff's proposal, in which the team assigned two deficiencies to Plaintiff.[5]  The first deficiency is set forth in full as follows:

> DEFICIENCY: The offeror's proposal is flawed as the design methodology to meet the two-factor authentication requirements (NGLD-M_SRD_0025 (Medium Assurance) and NGLDM_SRD_0033 (High Assurance)) does not allow the system to meet the USB data receiving (Req IDs: NGLD-M_SRD_: 0575; 0577; 0578; 0581; 0583; 0585; 0587) and Software/Firmware update via USB interface (NGLD-M_SRD_0573) requirements while meeting RMF and IASRD

---

[5] As mentioned previously, Plaintiff's initial proposal suffered from merely one deficiency: failure to "define a two-factor authentication approach for Medium Assurance (MA) mode (NGLD-M_SRD_0025)."  AR 6910.  It is the *effect* of Plaintiff's proposed solution to this initial deficiency—an external USB-C dongle that would commandeer the single USB-C port—that ultimately resulted in two of the new deficiencies in the final evaluation.

requirements.  The proposal does not discuss how the exchanges in the NGLD-M System Requirements Document Table 5 "NGLD-M Receiving Data Types and Interfaces" for the USB port are met when the design approach requires the continuous use of the only USB-C interface on the device to maintain a two factor authenticated session.  The proposal's approach to meeting the two-factor authentication requirements is an external USB-C dongle and ███████████████.  The proposed design has single USB-C port which is required to support both two-factor authentication dongle and USB data receiving requirements which physically does not allow the device to maintain a two-factor authenticated sessions [sic] and perform USB Receiving requirements.  On Volume 2, page 14 the Offeror proposes to resolve this conflict through the following statement "The external USB-C [Two-Factor Authentication] 2FA device is required to be attached during login authentication in both MA or HA modes and required to be inserted in response to periodic reauthentication."  According to IASRD TOK-2 "The authentication period for a token shall conclude when the token is removed from the host/terminal interface.  Under agreed upon conditions, the token may be required to be removed from the equipment after authentication of the user is completed."  The proposal does not discuss or mention any "agreed upon conditions" with the National Security Agency when an authenticated session can be maintained after removal of the token.  The proposed design does not meet the NGLD-M requirements without violating IASRD TOK-2 as well as adherence to Risk Management Framework security policies regarding authentication sessions to meet receiving data requirements across the USB.  The proposal does not covey an understanding of requirements nor convey a feasible approach to meeting the requirements.

AR 5066.[6]  In almost identical fashion, the second deficiency follows in full:

DEFICIENCY: The offeror's proposal is flawed as the design methodology to meet the two-factor authentication requirements (NGLD-M_SRD_0025 (Medium Assurance) and NGLDM_SRD_0033 (High Assurance)) does not allow the system to meet the USB distributing (Req IDs: NGLD-M_SRD_: 0576; 0579; 0580; 0582; 0584; 0586; 0588) while meeting RMF and IASRD requirements.  The proposal does not discuss how the exchanges in the NGLD-M System Requirements Document Table 7 "NGLD-M Distribution Data Types and Interfaces" for the USB port are met when the design approach requires the continuous use of the only USB-C interface on the device to maintain a two factor authenticated session.  The proposal's approach to meeting the two-factor authentication requirements is an external USB-C dongle and ███████████████.  The proposed design has single USB-C port which is required to support both two-factor authentication dongle and USB data distributing requirements which physically does not allow the device to maintain a two-factor authenticated

---

[6] The AR, as well as the "Corrected AR," both appear to mis-tab the initial and final technical evaluation reports.  According to the government's tabulation, the "Initial Proposal Evaluation" is located at Tab 23 and the "Final Proposal Evaluation" is at Tab 41.  In fact, the "Final" evaluation (dated June 29, 2021) is located at Tab 23 and the "Initial" evaluation (dated March 23, 2021) is located at Tab 41.

sessions and perform USB Receiving requirements.  On Volume 2, page 14 the Offeror proposes to resolve this conflict through the following statement "The external USB-C [Two-Factor Authentication] 2FA device is required to be attached during login authentication in both MA or HA modes and required to be inserted in response to periodic reauthentication." According to IASRD TOK-2 "The authentication period for a token shall conclude when the token is removed from the host/terminal interface.  Under agreed upon conditions, the token may be required to be removed from the equipment after authentication of the user is completed."  The proposal does not discuss or mention any "agreed upon conditions" with the National Security Agency when an authenticated session can be maintained after removal of the token.  The proposed design does not meet the NGLD-M requirements without violating IASRD TOK-2 as well as adherence to Risk Management Framework security policies regarding authentication sessions to meet distributing data requirements across the USB.  The proposal does not covey an understanding of requirements nor convey a feasible approach to meeting the requirements.

AR 5066-67.  In sum, Plaintiff's proposed 2FA solution would commandeer "the only USB-C interface on the device," rendering the port unavailable (and thus the device unable) to simultaneously perform other key tasks—distributing and receiving data[7]—that require an available USB port.  *Id.*

### a.   *The Army did not apply unstated evaluation criteria*

Plaintiff paints myriad objections to the TET's evaluation, none of which stick to the canvas.  It first contends that the Army

> evaluated CACI's approach to two-factor ("2-FA") authentication, despite the RFP expressly instructing offerors that they did not need to address, nor would they be evaluated, against certain RFP sections (which RFP sections included the offerors' approach to 2-FA), so long as they proposed to use the Government User Application Software ("UAS"), which CACI indisputably proposed to do.

CACI MJAR at 1; *see also id.* at 18 ("First, the Army should never have evaluated CACI's proposed solution for 2-FA.").  This line of argument quickly breaks under pressure.

To begin with, it appears that Plaintiff manufactured—or at the very least, misstated—a quote from the solicitation in defense of its assertion that the Army should never have "evaluated" its 2FA approach.  In its motion for judgment on the administrative record, Plaintiff purports to quote the solicitation: "[i]n particular, the RFP states that '[u]se of the Government UAS relieves the Offeror from providing any additional information for . . . Device User

---

[7] The solicitation states that the NGLD-M's USB capabilities are to be "used for supporting data movement with valid and approved systems and for charging of NGLD-M batteries.  Data to be moved includes, but is not limited to, SW/FW updates, certificate data (e.g., KMI IA(I), KE(I), IA(M), CA certificates, CRL/ARLs, web server certificates, etc.), mission plans, ECU profile data, CMS packages, and the like."  AR 1252; *see also* NGLD-M_SRD_0572-0588 (describing requisite functions "via USB interface").

Management SRD 3.2.2.'" CACI MJAR at 18 (quoting AR 1505).  The Court notes Plaintiff's choice of a short ellipsis, suggesting to the Court a single sentence is quoted.  Yet, the cited section reads in full as follows:

> L24.4 Sub-Factor 1.2. UAS Approach/KMI Implementation
>
> *Use of the Government UAS relieves the Offeror from providing any additional information for this sub-factor, apart from a statement that the Offeror will utilize the Government UAS.*  If the Offeror is choosing to develop and deliver their own UAS solution, the Offeror shall describe the proposed NGLD-M UAS design from perspectives aligned with the below Elements. This description shall be at a level of detail that provides the Government confidence that the Offeror has a design that will allow this UAS to satisfy the SRD requirements, incorporates KMI capabilities and management design requirements, takes non-functional requirements into consideration, and ensures fulfilment of all security requirements.

AR 1505 (emphasis added).  There is nothing in this paragraph referencing "Device User Management SRD 3.2.2," and certainly nothing referencing it within the *single sentence* that Plaintiff appears to quote.  To be fair, Plaintiff also cites to AR 1518, where the term does indeed appear but only after the conclusion of the full paragraph referencing "[u]se of the Government UAS . . . ."  AR 1518.  More importantly, however, these segments of the solicitation speak at most to an offeror needing not provide "any *additional* information" for a particular sub-factor.  AR 1505 (emphasis added).  There is nothing in either of Plaintiff's cited segments of the solicitation supporting the entirely different proposition that offerors "*did not need to address, nor would they be evaluated*" on whether their proposals satisfy the Army's baseline requirements for 2FA.  CACI MJAR at 1 (emphasis added).

Moreover, as the government correctly points out, Plaintiff's initial proposal resulted in a deficiency for failure to "define a two-factor authentication approach for Medium Assurance ("MA") mode (NGLD-M_SRD_0025)," AR 6910, yet Plaintiff did not take issue at that time with the Army—to borrow a phrase—having "evaluated [its] approach to [2FA] authentication." In fact, in response to the initial deficiency, Plaintiff revised its proposal to directly address the solicitation's 2FA requirements.  *See* AR 5435-36 (Plaintiff's "Technical Change Cover Sheet," preceding its revised proposal, explaining "[t]he MCL meets NGLD-M requirements for the submission of login credentials including a two-factor authentication (2FA) token (NGLD-M_SRD_0055, NGLD-M_SRD_0025 and NGLD-M_SRD_0033) as part of Authentication, Authorization, Accounting (AAA) state per SRD section 3.1 during user login" and "███████ ███████████████████████████████████ is being proposed to serve this purpose."); *see also* AR 5484.  In other words, instead of challenging the Army's authority to assign a deficiency *directly related to 2FA* in its initial evaluation, Plaintiff promptly revised its proposal.  Only now, post-award, does Plaintiff challenge the Army's authority to "evaluate" an offeror's 2FA approach.

Nevertheless, even accepting Plaintiff's contention—that use of the government's UAS precluded the Army's evaluation of Plaintiff's 2FA approach—there is simply nothing in the

final technical evaluation report suggesting that the Army actually "*evaluated* [Plaintiff's] *approach* to [2FA] . . . ." CACI MJAR at 1 (emphasis added). Rather, the evaluation report simply observes that Plaintiff's "proposed design has [a] single USB-C port which is required to support both two-factor authentication dongle and USB data distributing requirements which physically does not allow the device to maintain a two-factor authenticated sessions *and* perform USB Receiving requirements." AR 5066 (emphasis added). Stated differently, Plaintiff's chosen 2FA solution *revealed* a design limitation. This limitation could have manifested itself in an entirely different circumstance had Plaintiff, for example, proposed some other mission-critical peripheral be attached via USB while the device is operating. Plaintiff's proposed 2FA solution necessarily commandeers the single USB port in Plaintiff's design (discussed further below); thus, the identified flaw is in Plaintiff's *design*, not its 2FA solution or approach. Contrary to Plaintiff's suggestions, the Army was not questioning whether (or how) Plaintiff's proposed 2FA solution itself accomplishes 2FA. Instead, the Army took issue with Plaintiff's "design methodology," AR 5066-67, which precluded the device from accomplishing multiple requirements at the same time.

### b. Plaintiff's 2FA solution necessitates continuous use of the only USB port

Plaintiff next objects to the Army's conclusion that its particular "design approach requires the continuous use of the only USB-C interface on the device to maintain a two factor authenticated session." AR 5066. Recall, the Army evaluators observed that:

> [Plaintiff's] proposal's approach to meeting the two-factor authentication requirements is an external USB-C dongle and ███████████████. The proposed design has single USB-C port which is required to support both two-factor authentication dongle and USB data receiving requirements which physically does not allow the device to maintain a two-factor authenticated sessions and perform USB Receiving requirements. On Volume 2, page 14 the Offeror proposes to resolve this conflict through the following statement "The external USB-C [Two-Factor Authentication] 2FA device is required to be attached during login authentication in both MA or HA modes and required to be inserted in response to periodic reauthentication." According to IASRD TOK-2 "The authentication period for a token shall conclude when the token is removed from the host/terminal interface. Under agreed upon conditions, the token may be required to be removed from the equipment after authentication of the user is completed." The proposal does not discuss or mention any "agreed upon conditions" with the National Security Agency when an authenticated session can be maintained after removal of the token. The proposed design does not meet the NGLD-M requirements without violating IASRD TOK-2 as well as adherence to Risk Management Framework security policies regarding authentication sessions to meet receiving data requirements across the USB.

AR 5066; *see also id.* ("data distributing" deficiency). Plaintiff argues that the solicitation only requires 2FA in Medium and High Assurance ("HA") modes "when started," citing NGLD-M_SRD_0025 and NGLD-M_SRD_0033, and that "[a] requirement for 2-FA to be *continuous* is not included in the RFP or any other requirements." CACI MJAR at 20 (emphasis added).

According to Plaintiff, "[t]here is simply no SRD requirement for the 2-FA external USB device to remain inserted throughout a session . . . ." *Id.* The government counters, however, that the Information Assurance Security Requirements Directive ("IASRD"),[8] which is incorporated into the solicitation,[9] effectively requires that authentication be continuous, absent agreed upon conditions, when a design incorporates the use of a "token"[10] for 2FA, as Plaintiff proposed via its external USB-C dongle. USA MJAR at 32.

The Court reads the government's argument as the better of the two.[11] Per the relevant section of the IASRD:

> The authentication period for a token shall conclude when the token is removed from the host/terminal interface. Under agreed upon conditions, the token may be required to be removed from the equipment after authentication of the user is completed.

AR 7983. While the solicitation may not expressly require that authentication be "continuous," the IASRD—clearly incorporated into the solicitation—effectively creates a default or presumption that a token, if used for 2FA, remain inserted in the device for purposes of authentication absent agreed upon conditions. Plaintiff did not provide the Army with any such conditions; instead, it argues it did not need to address conditions for removal. CACI MJAR at 23. But, if Plaintiff is correct, where would that leave the evaluators? The Court, instead, accepts the government's invitation to "read the 2FA requirements in the SRD and the IASRD together." USA MJAR at 34. Although the solicitation "uses the term 'when started' in certain places, the cited portions of the SRD are silent on removal. The IASRD fills the gap and requires continuous 2FA by stating that the token can only 'be removed from the equipment after authentication of the user is completed' upon agreed upon conditions." *Id.* at 34-35 (citations omitted). Thus, absent such agreed upon conditions, or any evidence thereof, Plaintiff's 2FA

---

[8] The IASRD "is a National Security Administration (NSA) security document that contains a core set of product level security requirements for the protection of Top Secret Information." USA MJAR at 5 (citing AR 7894).

[9] The solicitation provides that "[t]he Offeror shall address the requirements outlined in the Engineering Development Performance Work Statement (PWS), Program Management Statement of Work (SOW), Contract Data Requirements Lists (CDRLs), NGLD-M System Requirements Document (SRD), Technical Security Requirements Document (TSRD), *and the Information Assurance Security Requirements Directive (IASRD)*," AR 1024 (emphasis added), and "[a]dditionally, requirements from the National Security Agency (NSA) including the Technical Security Requirement Document (TSRD) *and Information Assurance Security Requirements Document (IASRD)*," AR 1055 (emphasis added).

[10] The IASRD provides that "[a] token is a physical device that is used to store and carry cryptographic material (keys and certificates) to support user identity authentication. Tokens are typically small enough to be carried in a pocket and may take on a wide range of the form factors such as a smart card or universal serial bus (USB) token." AR 7982.

[11] It is worth noting that a sizable portion of Plaintiff's argument on this issue rests on the grounds that the Army "unreasonably identified Deficiencies for failure to meet requirements not stated among the RFP's evaluation criteria." CACI MJAR at 19. According to Plaintiff, "the RFP Section M identified the exclusive list of criteria to be used to evaluate the Technical Factor. Instead of using RFP Section M to evaluate CACI's approach to 2-FA, the Government cited to the SRD Traceability Matrix as the basis for these Deficiencies, which is distinct from the SRD and not included in RFP Section M, to support the two assessed 2-FA Deficiencies." *Id.* Confronted with the fact that the solicitation *did*, in fact, incorporate the traceability matrix, Plaintiff withdrew that particular protest ground. CACI Reply at 1 n.1; *see also* USA MJAR at 34.

approach would need to remain inserted in the device, necessitating an *additional* available USB port for data receiving and distributing purposes.

### c. *Plaintiff's proposed design only includes a single USB port*

The Court moves to what can safely be considered Plaintiff's central argument and objection: that "the Army inexplicably found that CACI's proposed design only included a single USB port, when, in fact, CACI's proposal clearly indicated that its proposed design included both a USB-C and a USB-2.0 port."  CACI MJAR at 1; *see also id*. at 14 ("[T]he evaluators mistakenly concluded that CACI's proposed MCL device design had just a single USB port."). In reviewing the record, however, there is nothing "inexplicable" at all about the Army evaluators' conclusion that Plaintiff's design includes a single USB port.  In fact, Plaintiff's own proposal says so.

First, section 1.1.1.1.6 of Plaintiff's proposal—notably titled "Physical External Interface"—includes a segment titled "USB" that, to any reasonable reader, sets forth the design's *USB* capabilities and functionalities:

> *USB* [SRD ID 569, 570, 588]: The MCL incorporates a ruggedized IP68-rated USB-C connector and corresponding dust cover.  The COTS USB-C connector supports two operating modes where mode selection is based on attached devices. These modes support either high speed USB 3.0 + USB 2.0 or Display Port + USB 2.0 interfaces through the single USB-C connector and fully supports USB On-The-Go (OTG) operation (*SRD ID 569, **USB 3.0 exceeds SRD threshold requiring USB 2.0***) . . . .   The USB-C interface supports the power rating required (supports 3A to 5A, battery requires 2.03A) to operate the device while charging the battery *(SRD ID 574, **Meets Objective**)*.  The MCL USB-C solution supports future innovation using the USB-C connector, which has become the standard interface for handheld and portable devices, including smartphones and laptops. USB-C is the next generation USB interface that is fully backward capable and future-proof.

AR 5478-79 (emphasis in original).  The Court draws special attention to the proposal's choice of wording.  Plaintiff's design "incorporates *a* ruggedized IP68-rated USB-C connector . . . ." *Id.* (emphasis added).  "*The* COTS USB-C connector supports two operating modes . . . ." *Id.* (emphasis added).  Most tellingly, "[t]hese modes support either high speed USB 3.0 + USB 2.0 or Display Port + USB 2.0 interfaces ***through the single*** USB-C connector . . . ." *Id.* (emphasis added).  To read this section of the proposal as indicating anything more than a single accessible USB port would be, frankly, "inexplicable" and unreasonable.  Indeed, there is no mention whatsoever of a second USB port in the section labeled "USB."  *See* AR 5478-79.

Plaintiff attempts to overcome this fact by first arguing that the Army unreasonably relied on Plaintiff's "prototype," which was shown during an optional demonstration and on which the Army allegedly should not have relied in assigning deficiencies to Plaintiff's proposal. According to Plaintiff,

> On February 4, 2021, prior to the Army's assessment of the related Deficiencies, [Plaintiff] provided the optional demonstration of its prototype product to designated Army evaluators.  As indicated in its Technical Proposal, [Plaintiff] had already prototyped ▮% of the SRD's hardware requirements prior to its proposal submission.  The prototype device that [Plaintiff] demonstrated already included a visible external USB-C port.  The printed circuit board in the CACI prototype also included a second built-in USB port, consistent with Figure 5, MCL Block Diagram in [Plaintiff's] Technical Proposal.  Because [Plaintiff] had ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ this second port, this second USB port was not visible to the Army's evaluators during the product demonstration.  It appears that the Army's evaluators relied in significant part on their external view of the CACI prototype product, rather than [Plaintiff's] unambiguous proposal responses . . . to conclude erroneously that [Plaintiff's] MCL device design included only a single USB port.

CACI MJAR at 15 (citations omitted).  Plaintiff further argues that "[s]uch an evaluation contradicts the RFP instruction that 'Offeror demonstrations may only positively impact the risk rating based on the demonstrated ability to meet the NGLD-M requirements.'"  *Id.* at 15-16 (citing AR 1487).  Even accepting as true Plaintiff's contention that a *demonstration* may not negatively impact an offeror's evaluation, nothing in Plaintiff's cited segment of the solicitation provides that the *prototype itself*, if presented as the offeror's revised proposal, may not negatively impact an offeror's risk rating.  And from all appearances, the same or similar prototype shown during the demonstration is what Plaintiff presented to the Army in its final, revised proposal.

For example, Figure 4 of Plaintiff's revised proposal demonstrates the "MCL Physical Design Elements" and declares that "[o]ur functional *prototype* is ready for Government UAS/API development and integration on Day 1 of award."  AR 5473 (emphasis added).  Figure 4 unambiguously shows a *single* USB-C port on the self-identified "prototype," as follows:



AR 5473.  As to the *demonstration* prototyp e, Plaintiff admits it "included *a* visible USB-C port" and that "[b]ecause ██████ external ███████████████████ *this second port, this second USB port was not visible to the Army's evaluators* during the product demonstration."  CACI MJAR at 15 (emphases added).  Accordingly, if Plaintiff *still* "████████████████████████████" for consideration in its revised proposal, as Figure 4 appears to indicate, then the Court considers it entirely reasonable to conclude that—to borrow Plaintiff's wording—its alleged "second USB port *was not visible* to the Army's evaluators during" the *final evaluation* of Plaintiff's proposal. Plaintiff's demonstration did not undermine its evaluation; its self-identified "prototype" design, which "is ready for Government UAS/API development and integration on Day 1 of award," however, ultimately did.  AR 5473.

Plaintiff attempts to rescue itself by pointing to section 1.1.2.1 of its proposal, wherein it states that the design "incorporates an additional USB 2.0 interface to support the future addition of devices like ██████████████████████."  AR 5485; *see also* CACI MJAR at 17 ("While CACI did propose only a single *USB-C* port, there was no RFP requirement to propose more than one, or any, *USB-C* port, and its proposed device design plainly includes a second USB port, a USB-2.0 port, which is capable of meeting all of the RFP's USB data distribution and receiving requirements.") (emphasis in original).  Additionally, Plaintiff asserts that its "device design clearly includes two COTS-item USB ports which have already achieved TRL-9: a USB-2 Expansion Port and a USB-C Port."  CACI MJAR at 16 (citing AR 5474).  None of these arguments or cited pages of the record support a finding that the Army acted arbitrarily or capriciously in assigning deficiencies to Plaintiff's proposal.

First, the proposal's mention of "an additional USB 2.0 interface" appears not in the "USB" or "Physical External Interface" sections of the proposal, but rather pages later, buried within a section concerning "Operating System."  AR 5485.  Any reasonable evaluator—or any reasonable *reader* for that matter—when searching the proposal for indications of a second (or third, or so on) USB port would rationally turn to the sub-section titled "USB" under the section "Physical External Interface."  Agencies must indeed review the whole proposal, but they are not compelled to comb the record for information that an offeror does not otherwise adequately present through a well-written proposal.  *KSC Boss All., LLC*, 142 Fed. Cl. at 382 ("An offeror has the responsibility to submit a well-written proposal with adequately detailed information that allows for a meaningful review by the procuring agency." (quoting *Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture v. United States*, 89 Fed. Cl. 735, 744 (2009))).[12]

---

[12] For good measure, the Court observes that—to the best of its knowledge after a thorough review of the record—the first instance in which the term "USB-2.0 port" occurs is *not* within Plaintiff's proposal but, rather, in Plaintiff's complaint and briefings to this Court in the instant matter.  *See* ECF No. 1 at 37 ("Compl.") (Plaintiff asserting its "proposed device design plainly includes a second USB port, a USB-2.0 port, which is capable of meeting all of the RFP's USB data distribution and receiving requirements.").  Plaintiff's proposal does, however, use the term "USB-C port" multiple times.  *See* AR 5484, 5520.  Its proposal also uses the term "USB-C connector" multiple times, which under a plain reading the Court interprets as interchangeable with USB-C "*port*."  *See, e.g.*, AR 5478 ("The MCL incorporates a ruggedized IP68-rated USB-C connector and corresponding dust cover.").  Yet, the term "USB-2.0 connector" appears nowhere in the proposal.

Second, as the government points out, USB "2.0" (and "3.0") "are protocols used to identify the manner in which a USB device communicates and not physical characteristics used to describe a USB port . . . ." USA MJAR at 30. But the Court need not take judicial notice of that technical fact; rather, Plaintiff's own proposal demonstrates the distinction. *See* AR 5478 ("The COTS USB-C connector supports two operating modes where mode selection is based on attached devices. *These modes support either high speed USB 3.0 + USB 2.0* or Display Port + USB 2.0 interfaces *through the single USB-C connector . . . .*") (emphasis added).[13] Plaintiff, for that matter, *even concedes as much* in its motion for judgment on the administrative record. CACI MJAR at 10 n.4 ("USB 2.0 and USB 3.0 defines the data transfer speed and the function of the USB cable, while USB-C refers to the shape of the cable plugs and ports.").

Third, context suggests that Plaintiff knew exactly what it meant when it proposed a "single USB-C connector." AR 5478. In presenting the "MCL Platform Architecture," Plaintiff's final proposal states that "[i]n addition to ███████████████████ . . . there are ███████ peripheral circuit cards: ██████████████ ." AR 5485. If Plaintiff's design actually includes a "second USB port, a USB-2.0 port," CACI MJAR at 17, one should reasonably expect its identification-—or at least, its mention—in the MCL Platform Architecture description of Input/Output peripheral circuit cards. Yet, only the USB-C is expressly paired with an Input/Output peripheral circuit card in Plaintiff's final proposal. Moreover, the way in which Plaintiff's proposal describes its USB-C port differs markedly from its passing reference to "USB 2.0." For example, Plaintiff's design "incorporates a *ruggedized IP68-rated* USB-C connector *and corresponding dust cover*." AR 5478 (emphasis added). In contrast, its alleged second USB port is described—recall, in an entirely separate section of the proposal—as merely "an additional . . . interface to support the future addition of devices ██████████████ . . . ." AR 5485. Plaintiff's USB-C is also presented as "support[ing] the power rating required (supports 3A to 5A, battery requires 2.03A) to operate the device while charging the battery *(SRD ID 574, Meets Objective)*." AR 5478 (emphasis in original). Yet, nowhere in the proposal does Plaintiff describe its "USB 2.0" as meeting similar requirements.

Fourth, context further suggests that even if Plaintiff contemplated a second USB *port*, it was only in terms of a future addition to the device—not something that would be available to the user on Day 1. For example, Plaintiff asserts that Figure 5, the "MCL Block Diagram," shows a "USB-2 Expansion Port and a USB-C Port," thus its design "clearly includes two COTS-item USB ports . . . ." CACI MJAR at 16 (citing AR 5474). If both were physical ports available on Day 1, however, there would presumably be no need to label one port an "expansion" but not the other. Moreover, the proposal's reference to "an additional USB 2.0 interface" mentions only the "*future* addition of devices ██████████████ ██████ ." AR 5485 (emphasis added). Relatedly, Figure 10 demonstrates the location on the device for a "*Future* ██████████████ ," AR 5479 (emphasis added), and the same page in the proposal states that Plaintiff's "design provisions a dedicated interface and external

---

[13] The Court also suggests that it would be reasonable for the Army to wonder what *kind* of port Plaintiff has in mind for its "USB 2.0 interface." Does Plaintiff intend for it to use a USB-A connector? USB-B? USB Micro-A? Mini-A? Micro-B? Mini-B? Plaintiff does not say, and neither the government nor the Court should have to guess.

connector in support of the optional ███████████ accessory.  This requirement is not included in our Integrated Master Schedule (IMS) as we expect this requirement to be addressed through an Engineering Change Proposal (ECP)."  *Id.*  As the government correctly points out, "[i]f [Plaintiff's] proposed design already included a second USB port, . . . there would be no need for an ECP.  ███████████████ would simply plug into the back of the existing device."  USA MJAR at 29-30 (citation omitted).

In short, the Court finds nothing unreasonable about the Army's technical evaluation of Plaintiff's proposal.[14]  The solicitation plainly required 2FA.  If 2FA was to be accomplished via a token, as Plaintiff's design proposes, the authentication period would end upon removal of the token, absent agreed upon conditions.  Plaintiff provided no such conditions or evidence thereof. An additional USB port was therefore needed for the NGLD-M to simultaneously perform other critical functions.  Plaintiff's design proposal—under any reasonable or rational reading— incorporates a *single* USB port, which, as was reasonably determined by the Army, cannot carry out necessary functions simultaneously.  Accordingly, the Army evaluators were neither arbitrary nor capricious in assigning two deficiencies to Plaintiff's design methodology.

## 2.  The Army Reasonably Assigned a Deficiency for CACI's Failure to Provide Size and Weight Information for its 2FA Solution

CACI also asserts that the Army acted unreasonably in assigning it a deficiency related to the Size, Weight, and Power ("SWAP") requirements of this procurement.  *See* CACI MJAR at 24-29.  As is explained below, the Court finds that not only were the Army evaluators reasonable in assigning CACI a deficiency for failing to satisfy the SWAP requirements, but that they were entirely correct in doing so.

As a threshold matter, the Court briefly reviews the unambiguous SWAP requirements for this procurement.  The Army required that the NGLD-M weigh less than eight pounds and be no greater than 7.75" long, 4.5" wide, and 2.5" deep.  AR 1260.  These dimensions not only provide parameters for the device itself, but for "operational hardware used to perform NGLD-M functions."  *Id.*  Operational hardware encompasses the "primary device, batteries and accessories required to operate the NGLD-M."  *Id.*  Only "[s]tandalone cables that provide a means of interfacing with systems, devices or power sources that are outside of the NGLD-M system context are exempt from the SWAP requirements."  *Id.*

---

[14] Plaintiff makes one last pitch, arguing that the 2FA deficiencies are the product of a latent ambiguity in the solicitation and that any such ambiguity should be resolved against the government as the drafter of the solicitation.  According to Plaintiff, "[t]he plain reading of the SRD Traceability Matrix the Army cites for the requirement is that 2-FA is only required 'when started.'"  CACI MJAR at 29-30 (citation omitted).  A plain reading of the solicitation, including the IASRD requirement when a "token" is used for 2FA, reveals no latent ambiguity. As the government correctly points out, any such ambiguity—if one exists—would be patent, as the SRD's demand for authentication "when started" would facially conflict with the IASRD's requirement that removal of the "token" occur only after "agreed upon conditions."  USA MJAR at 40.  Plaintiff, thus, would need to have challenged the solicitation pre-award, not post-award.  *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007) ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims.").

CACI's initial proposal complied with the solicitation's SWAP requirements. *See* AR 1565. However, after CACI revised its proposal to address a question that the Army raised regarding how 2FA would be achieved in Medium Assurance mode, the Army identified that this solution created an issue regarding SWAP compliance. *See* AR 5063-64. This is because CACI proposed to use an external dongle, namely the YubiKey, to successfully achieve 2FA, but in doing so it neglected to update its SWAP information or provide the requisite measurements to the Army. Unfortunately for CACI, when it removed one of the Hydra's heads, three more appeared in its place. The end result of CACI adding the YubiKey to achieve 2FA was CACI not being awarded the NGLD-M contract because of three new deficiencies: two related to the requirements for USB functionality (discussed above) and one for failure to demonstrate SWAP compliance. AR 7138.

Regarding the deficiency assigned for failure to provide updated SWAP information, CACI argues that the Army erroneously assigned that deficiency because the YubiKey is an external device and thus is not included in the SWAP requirements. *See* CACI MJAR at 25-26. CACI analogizes the YubiKey to a cellphone or RSA token, both of which are external devices, and asserts that because neither of those would be considered operational hardware, neither should the YubiKey.[15] *See* CACI Reply at 25-26. Further, CACI argues that because the device would have a limited use outside of MA and HA mode, the YubiKey is not operational hardware because the YubiKey is only needed to achieve 2FA. *See* CACI MJAR at 26-28.

It is apparent to the Court that the Army evaluators reasonably determined that the SWAP dimensions in CACI's revised proposal did not include the YubiKey. In fact, CACI's updated proposal does not indicate any changes between its initial and final proposals in the sections pertaining to SWAP.[16] *Compare* AR 1565 *with* AR 5474 (changes denoted in blue text). CACI also concedes as much. CACI MJAR at 28. What CACI contests, however, is the determination that the YubiKey is operational hardware. *See generally* CACI MJAR 25-28.

According to the Army, knowing the size and weight of all operational hardware in an offeror's proposal is important because: 1) the NGLD-M could, and is expected to be, utilized on the battlefield; and 2) it needs certain external operational hardware to function. *See* AR 1348; 1207-10 (describing the various triggers and requirements to enter different modes). Most important to the SWAP deficiency, the device requires 2FA to enter MA and HA modes, AR 1272-73, which CACI ultimately chose to accomplish via an external USB dongle. *See* AR 5661. The solicitation makes clear that without successful 2FA, the device is useless outside of turning on, being in alarm mode, or zeroizing. *See* AR 1207-10. The key question, then, is whether the YubiKey is operational hardware necessary to "operate the NGLD-M"?

In answering this question, it is important to focus on what the NGLD-M is: a device to decrypt and encrypt information, namely commands and orders on the battlefield. *See* AR 1348. That information is only accessible if users are able, through 2FA, to verify that they are who

---

[15] CACI offers no support for the proposition that a cellphone or an RSA token would not be considered operational hardware.

[16] The Court notes that despite there being no blue text indicating a change in the final bid, there are some changes in the weight of the MCL with accessories. That being said, the weight of the device and operational hardware is irrelevant to CACI's SWAP deficiency. *Compare* AR 1565 *with* AR 5474.

they say they are and have the appropriate clearances to receive such information. *See generally* AR 7971-87 (defining 2FA and its purpose/goals). In arguing that the YubiKey is not operational hardware, CACI in fact demonstrates its own misunderstanding of the SRD requirements. The solicitation makes clear that there are only two modes the NGLD-M can operate in: MA and HA. AR 1268.[17] The only way to activate those modes is to first achieve 2FA. *See* AR 1272-73; *see also* 1207-10 (diagramming the "life cycle" of NGLD-M use). CACI proposed to do so with the YubiKey. *See* AR 5484. The Court finds that it is reasonable that the Army concluded that without the YubiKey, CACI's device could not "operate." Thus, because the YubiKey would be something required to operate the NGLD-M, it follows that the YubiKey is operational hardware. *See* AR 1260 ("operational hardware may contain . . . accessories required to operate the NGLD-M."). Accordingly, CACI failed to comply with the terms of the solicitation when it did not include the YubiKey's dimensions in its revised, final proposal.

Additionally, the Court is not persuaded by CACI's argument that the Army evaluators "just Google" the YubiKey's measurements to give them the confidence that the SWAP requirements would be met—if only it were that easy. In fact, the Court notes that CACI never specifies *exactly which YubiKey product* it plans to use. *See* CACI MJAR at 28-29 ("CACI specifically identified the brand and model of the COTS device that it proposed to achieve 2-FA-the YubiKey ███ - but it did not include the physical specification of the YubiKey . . . . there *are several versions of its COTS YubiKey* ████████████.") (emphasis added). The Court understands that CACI, for argument's sake, utilized the measurements of the longest, commercially available YubiKey. But, importantly, the arena to consider whether the YubiKey actually fits within the SWAP requirements is at the agency—during procurement—not in the midst of post-award litigation. *See Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005) ("[L]est the admission of evidence not considered by the agency below and its consideration by the court convert the 'arbitrary and capricious' standard into effectively *de novo* review."). Beyond that, in the course of briefing this motion, three different measurements of the full length of CACI's device were asserted. *Compare* CACI MJAR at 29 (total length of ███ ") *with* USA MJAR at 39 (total length of ███ ") *and* CACI Reply at 26 (noting the YubiKey would be inserted into the NGLD-M, which results in a measurement ██ mm less than the government's calculations). If counsel, including Plaintiff's own counsel, are unable to arrive at a consensus of the total length of CACI's device, then the Army likewise did not have the information necessary to determine whether CACI's device—with the YubiKey inserted—met the SWAP requirements. *See* AR 1504 ("The Offeror shall describe it's [sic] proposed NGLD-M physical design to a level of detail that provides the Government confidence that the proposed design will meet Size, Weight and Power (SWAP) . . . requirements listed in the SRD.").

Attempting to land one last punch, CACI argues that its interpretation of the YubiKey as *not* operational hardware is equally reasonable as the Army's determination that it is, which

---

[17] CACI's argument regarding this appears to conflate the idea of "states" and "modes" for the NGLD-M. The NGLD-M is only capable of two modes: MA and HA. *See* AR 1268. What CACI relies on for purposes of this argument are, in fact, *states*, which are defined as "the current snapshot of the system at a given time, for example Power Up, Normal Operation: Interactive etc. The state can transition to another state based on triggers or stimulus." *Id.*

gives rise to a latent ambiguity.  *See* CACI MJAR at 30-32.  Ambiguities are latent if they are not apparent on the face of the solicitation. *Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed. Cir. 1993); *see also C.N. Constr., Inc. v. United States*, 107 Fed. Cl. 503, 512 (2012) ("A latent ambiguity is not apparent on the face of the solicitation and is not discoverable through reasonable or customary care.") (citation and internal quotations omitted).  In contrast, a patent ambiguity "is present when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties." *Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1381 (Fed. Cir. 2000).  The Court agrees with the government and Defendant-Intervenors that the plain language of the SRD is clear in defining operational hardware as including those accessories that make the NGLD-M operational.  The only evidence CACI directs the Court to in its attempt to demonstrate an ambiguity is an alleged inconsistent treatment between its YubiKey and SNC's CIK.  *See* CACI MJAR at 31.  CACI does not point to any place in the solicitation as the source of the alleged ambiguity, nor does it cite the solicitation's definition of "external device" and argue how the YubiKey fits into that definition. *See generally* CACI MJAR at 30-32.  The Court agrees with the Army that the YubiKey unambiguously fits within the definition of operational hardware.

In sum, the Army must be given enough information to draw a reasonable conclusion that CACI's proposed device would meet the solicitation's SWAP requirements.  CACI failed to include a critical piece of such information in bidding for this contract.  Therefore, the Army did not act unreasonably when it assigned CACI a deficiency for failing to meet the SWAP requirements.

## CONCLUSION

For the reasons set forth above, Plaintiff failed to establish that it has standing to bring the instant protest.  As stated in the Court's December 21, 2021, order, ECF No. 61, Plaintiff's complaint is dismissed for lack of subject matter jurisdiction, and the Clerk shall enter judgment accordingly.

The parties shall confer to determine agreed-to proposed redactions to this opinion.  On or before **January 10, 2022**, the parties shall file a joint status report indicating their agreement on proposed redactions, attaching a copy of those pages of the Court's opinion that contain proposed redactions, with all proposed redactions clearly indicated.

**IT IS SO ORDERED**.


s/ Zachary N. Somers
ZACHARY N. SOMERS
Judge